IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 02-10542 |
| FOOD FAST HOLDINGS, LTD. ET AL., | § | (Chapter 11) |
| | § | (Jointly Administered) |
| DEBTORS. | § | |

## MEMORANDUM IN SUPPORT OF
## FOURTH AND FINAL APPLICATION OF VINSON & ELKINS L.L.P.
## FOR ALLOWANCE OF FEES AND EXPENSES (DKT #824)

### Contents                                          page

I. SUMMARY OF THE FINAL FEE REQUEST................................................................2
II. HISTORICAL ANALYSIS .................................................................................4
    A.  The history of U.S. bankruptcy law and practice informs the issue. ..............4
    B.  The historical notion of "economy" in fees does not obtain under the Code...6
    C.  Historically, the boundary between the Eastern and Northern Districts of
        Texas has been porous. ....................................................................7
        1.  V&E has a distinguished history of representing clients in the
            Eastern District ......................................................................7
        2.  Dallas lawyers have a long history of representing debtors and
            creditors in the Eastern District. .............................................8
III. TEN REASONS THE APPLICATION SHOULD BE APPROVED AT V&E'S RATES.8
    A.  The relevant community is the State of Texas. ...............................................8
        1.  The statute is the starting point. .............................................8
        2.  The trend of the cases reflects the increasingly cosmopolitan
            nature of bankruptcy practice...............................................10
        3.  Tyler and Dallas lie in such close proximity as to be considered
            one community. ....................................................................11
         4.  The community has become the State of Texas...............................12
    B.  This is a significant case.............................................................12
    C.  This case is a success...............................................................14
    D.  V&E efficiently performed complex Chapter 11 and transactional work. ......15
    E.  A Tyler firm could not have handled the representation. ..............................17
    F.  The creditors have approved V&E's rates, and the money is set aside........17
    G.  The lenders and creditors hired New York, Atlanta, and Dallas lawyers;
        hiring Dan Stewart and V&E leveled the playing field for the Debtors. .........19
    H.  V&E is the Debtors' choice of counsel............................................19
    I.  The Debtors had a venue choice...................................................20
    J.  The dearth of litigation reflects the significance of the case and the value
        of Debtors' counsel...................................................................20
IV. CONCLUSION...........................................................................................21

TO THE HONORABLE BILL PARKER, UNITED STATES BANKRUPTCY JUDGE:

VINSON & ELKINS L.L.P. ("V&E") files this Memorandum in support of its *Fourth and Final Application for Allowance of Fees and Expenses as Counsel for the Debtors* (Dkt # 824, the "Final Application"), and respectfully submits:

## I.   SUMMARY OF THE FINAL FEE REQUEST

1.      V&E's fee applications and the Court's prior awards are summarized:

| Application[1] | Fee Amount Requested | Interim Award | Not Approved Due to Rate | Final App. Request |
|---|---|---|---|---|
| 1st Interim for 1/23/02 – 5/21/02 (Dkt #166) | $270,279.00 | $167,733.00 | $58,355.50 | $58,355.50 |
| 2nd Interim for  5/22/02 – 10/31/02 (Dkt #297) | $298,427.00 | $202,457.00 | $77,217.00 | $77,217.00 |
| 3rd Interim for 11/1/02 – 1/10/03 (Dkt #494) | $160,189.50 | $109,790.50 | $39,656.60 | $39,656.60 |
| 4th and Final for 1/11/03 – 5/12/03 (Dkt #824) | $220,000.00[2] | | | $220,000.00 |
| **Subtotals** | **$948,895.50** | **$479,980.50[3]** | **$175,229.10** | |
| **FEE AMOUNT NOW REQUESTED FOR PAYMENT** | | | | **$395,656.60[4]** |

2.      V&E requests final allowance of (i) its fees and expenses that were awarded on an interim basis, (ii) its fees and expenses for the post-confirmation period January 11-May 12, 2003, and (iii) the portions of the prior interim applications that were not approved due to hourly rate. V&E accepts the Court's deductions, as set forth in the three prior orders, of certain hours and a small amount of expenses (totaling $76,237.10) for which compensation and reimbursement had been sought in the prior interim applications. Therefore, at the hearing on the Final Application, the primary issue is the appropriate hourly rate to apply in the lodestar calculation to the hours of

---

[1] This chart does not include out-of-pocket expenses, reimbursement of which has been allowed substantially in full.
[2] All of these requested fees were incurred for post-confirmation services.
[3] The Debtors have paid all interim amounts awarded to V&E.
[4] In addition, the Final Application requests reimbursement of $23,430.30 of expenses.

attorneys' services rendered by V&E in both the final period and the earlier periods of this successful case.

> 3.   In its interim orders, this Court stated:

> With regard to an evaluation as to whether the Applicant's requested compensation is reasonable, the court notes that the Applicant has requested compensation at hourly rates substantially greater than those prevailing in this community for attorneys of similar experience in similar cases. Though the Applicant enjoys an excellent reputation before this Court and others, this case has no great regional or national significance. The services detailed in the Application cannot be accurately described as being particularly novel or complex, nor do they require any special skill or experience, other than those possessed and utilized by competent Chapter 11 practitioners in this area.[5]

The Court continued:

> The Court has carefully considered this issue and seeks to avoid any conclusion which appears parochial or capricious.   The Court acknowledges that the compensation at substantially greater rates than those prevailing in the local area may be justified if the case is particularly complex or if it demands greater manpower or a degree of expertise unavailable in the local market.   Conversely, however, if a local professional with the required knowledge, skill and expertise could have been retained to provide a commensurate level of service, an out-of-area professional with a customary billing rate substantially greater than the prevailing local rate may be awarded "reasonable compensation," though computed at a billing rate significantly less than his customary level.[6]

Accordingly, throughout this case, V&E has been compensated at less than its customary rates.

> 4.   V&E respectfully disagrees with the Court's interim determination, and

appreciates the opportunity afforded by the Court to present its case for the appropriateness of its customary rates.  This Memorandum submits V&E's argument and authorities on the issue.  Now, with perspective sharpened by the passage of time

---

[5] First Fee Order at 2 –3.
[6] First Fee Order (Dkt #246) at 3-4 (emphasis added).  Essentially the same language appears in the Second and Third Fee Orders (Dkt ##636 and 878).

following the Effective Date of the Plan of Reorganization, the outcome of V&E's legal effort to reorganize the Debtors and the reasonableness of the fee can clearly be seen.

## II.   HISTORICAL ANALYSIS

### A.   The history of U.S. bankruptcy law and practice informs the issue.

5.      The historiography of insolvency law in the United States has undergone rapid advances in the past two years with the publication of three books.  See Bruce H. Mann, Republic of Debtors: Bankruptcy in the Age of American Independence (Cambridge: Harvard University Press, 2002); Edward J. Balleisen, Bankruptcy and Commercial Society in Antebellum America (Chapel Hill:  University of North Carolina Press 2001); David A. Skeel, Jr., Debt's Dominion: A History of Bankruptcy Law in America (Princeton: Princeton University Press, 2001).  See also U.S. Courts for the Second Circuit, Committee on History and Commemorative Events, The Development of Bankruptcy and Reorganization Law in the Courts of the Second Circuit of the United States (Matthew Bender & Co., 1995).

6.      Professor Mann found that a culture of debt and debt relief developed over the 18th century and that the first Bankruptcy Act, that of 1800, gave debtors an amount of leverage that encouraged commercial compromises.  Professor Balleisen chronicled the era of the second U.S. bankruptcy law, the Act of 1841, and found that, although short lived, the act effectively provided discharge relief not only to merchants but also to land speculators, entrepreneurs, and ordinary people.  Both of the first Bankruptcy Acts induced certain lawyers to become bankruptcy specialists, particularly in New York and the urban markets.  Professor Skeel (a former bankruptcy lawyer) produced the first book-length survey and synthesis of the history of American bankruptcy law since

Charles Warren's effort in 1935.[7] He posits three general eras in this history: the birth of federal insolvency law in the nineteenth century, the Great Depression and the New Deal, and the period after adoption in 1978 of the present Code.

7. Distilled to a single thesis, the historians have collectively concluded that U.S. bankruptcy law has developed and evolved over three centuries in response to economic and market forces (with, of course, a fair admixture of politics) to become a commercial, rather than moral, code. The evolution of the law reflects that credit and debt have always driven the free-market economic development of this nation, while generating unique legal problems that require skillful lawyering to craft solutions to the problems of failure and financial "embarrassment." These books illuminate the increasing professionalization and specialization – of the bankruptcy bench, the bankruptcy law, and the bankruptcy bar – over the years.

8. Prosecuting and defending actions for debt have been a staple of American lawyers' work for four centuries. Beginning with the rise of the equity receivership, developed by the Wall Street bar of the late 19th century,[8] as the means by which the railroads and other businesses could be rehabilitated in the absence of federal legislation, and continuing with the growth of reorganization practice following the adoption of the Bankruptcy Code,[9] urban-based lawyers have always been heavily

---

[7] Collectively, these three books have advanced the study of the history of insolvency law far beyond the contours of Charles Warren, Bankruptcy in United States History (1935) and Peter J. Coleman, Debtors and Creditors in America: Insolvency, Imprisonment for Debt, and Bankruptcy 1607-1900 (Madison: State Historical Society of Wisconsin, 1974). Other useful, recent contributions to the literature include McCoid, Discharge: The Most Important Development in Bankruptcy History, 70 Am. Bankr. L.J. 163 (1996); Gross, Ladies in Red: Learning from America's First Female Bankrupts, 40 Am. J. Legal Hist. 1 (1996); Tabb, The History of the Bankruptcy Laws in the United States, 3 Am. Bankr. Inst. L. Rev. 5 (1995); Frimet, The Birth of Bankruptcy in the United States, 96 Com. L.J. 160 (1991).
[8] James D. Ely, Railroads and American Law (Lawrence: University of Kansas Press, 2001), at 177-85.
[9] Professor Skeel concluded that it has been the 1978 reform of reorganization law that has brought the nation's larger law firms back into bankruptcy practice. Skeel, Debt's Dominion at 20.

involved, and highly specialized, in the representation of significant business debtors and creditors' in reorganization cases filed in bankruptcy courts located in cities and venues both near and far from their home offices.

### B. The historical notion of "economy" in fees does not obtain under the Code.

9.      It is useful also to recall the legislative history of Bankruptcy Code § 330. Under the Bankruptcy Act, a bankruptcy court could compensate the provider of legal services to the estate if the amount of the fee was "reasonable." See 11 U.S.C Section 104 (Supp. 1976); Bankr. R. 210(c)(1). It was this statute that the Fifth Circuit was interpreting in the oft-cited In re First Colonial Corp. when it determined that the Johnson v. Georgia Highway Express, Inc. laundry list of factors must be applied.

10.      While the new statute, Bankruptcy Code § 330, continues to provide for allowance of "reasonable" fees, the legislative history of the Code demonstrates that Congress overruled the prevailing "notions of economy of the estate in fixing fees." H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 330 (1977), U.S. Code Cong. & Admin. News 5963, 6286. Such notions were considered "outdated" and had "no place in a bankruptcy code." Id. Reviewing the historical standard applied to determine reasonableness of compensation prior to the Code, Judge Abramson observed:

> Policies of economy of administration and conservation of the estate were controlling factors in compensation under the Bankruptcy Act. Trustees and attorneys were considered public officers and not entitled to the same compensation they could receive in private practice. Accordingly, pre-Code compensation meant fee awards in amounts at the "lower end of the spectrum of reasonableness." . . . . The system aroused fears that qualified practitioners would flee to more profitable areas of law.
> . . . .
> Congress responded to the fear of practitioner flight and enacted a more liberal compensation scheme under the Bankruptcy Code. Congress downplayed notions of economy of administration and provided that

> compensation in bankruptcy cases should be comparable to what is
> charged in nonbankruptcy matters.

See In re Property Co. of America Joint Venture, 110 B.R. 244, 249-50 (Bankr. N.D.

Tex. 1990).[10]   Therefore, under Bankruptcy Code § 330, the Court's award of

compensation "'must be guided not merely by what rate the applicant charges its

nonbankruptcy clients, but by what range of rates is charged by attorneys of

comparable competence for comparable services in the comparable community or

marketplace.'"[11]

### C. Historically, the boundary between the Eastern and Northern Districts of Texas has been porous.

11.   Although historically the Tyler bar tended toward insularity,[12] the boundary

between the Eastern and Northern Districts of Texas has always been highly porous.

#### 1. V&E has a distinguished history of representing clients in the Eastern District

12.   Virtually since its inception in 1917, the firm of V&E has continuously

represented clients in all manner of transactional, litigation, and insolvency matters in

the Eastern District of Texas.  See Harold M. Hyman, Craftsmanship and Character: A

History of the Vinson & Elkins Law Firm of Houston, 1917-1997 (Athens: University of

Georgia Press, 1998); Nicholas G. Malavais, Bless the Pure & Humble: Texas Lawyers

and Oil Regulation, 1919-1936 (College Station: Texas A&M Press, 1996) (written

largely from material in the V&E archive).

---

[10] See also In re Temple Retirement Community, Inc., 97 B.R. 333, 340-41; In re Cambern, 134 B.R. 565, 567 (Bankr. E.D. Tex. 1991).
[11] Temple Retirement, 97 B.R. at 342.
[12] For instance, Tom Pollard, Sr. had trouble establishing his law practice in Tyler in the twenties because he was an outsider . . . he was from Edom, not a "B.I.T." ("born in Tyler").  Edna M. Pollard, The Man from Edom (Fort Worth: Branch Smith, Inc., 1972), at 47-48.

### 2. Dallas lawyers have a long history of representing debtors and creditors in the Eastern District.

13.   In the past twenty years, Dallas bankruptcy lawyers have been heavily involved as counsel for debtors and creditors in many substantial Eastern District Chapter 11 proceedings.  Just a few examples are:

- In re Fender and Zapata – Dallas counsel for debtor and for lenders (oil, gas, and real estate case)

- In re DeltaUS f/k/a Delta Drilling Corporation[13] – Dallas counsel for debtor and for lenders (drilling company)

- In re Endevco – Dallas counsel for debtor and for lenders (natural gas pipelines)

- In re Sabine Development and In re Waller Creek, Ltd. – Dallas counsel for debtors; Dallas and Houston counsel for lenders (hotel and office development)

In those cases, Judge Houston Abel awarded fees to the debtor's counsel from outside the Eastern District at their customary rates.  Consider also:

- In re U.S. Brass – Dallas, New York, and Tyler counsel for debtor; creditors' counsel from Dallas and many major cities

14.   It may be observed that of the two attorney members of the Court History Committee of the United States District Court for the Eastern District of Texas, one is from Tyler and the other is from Dallas.  See General Order No. 01-8.

## III. TEN ESSENTIAL REASONS THE FINAL APPLICATION SHOULD BE APPROVED AT V&E'S CUSTOMARY RATES

### A. The relevant community is the State of Texas.

#### 1. The statute is the starting point.

15.   The starting point for analysis of V&E's requested fees is Bankruptcy Code § 330(a)(1)(A), which, as amended in 1994,  provides:

---

[13] See James Presley, Never in Doubt: A History of Delta Drilling Company (Houston: Gulf Publishing Co., 1981).

(a)(1)  After notice to the parties in interest and the United States Trustee and a hearing and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—

(A)  reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person . . . [14]

(3)(A)  In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

. . .

(E)  whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Bankruptcy Code § 330(a)(1), (3) (emphasis added).

16.    It may be noted that the statute does not contain any geographic limits to be applied in ascertaining the reasonableness of a fee.  However, as commonly understood, the statute requires the court to compute a lodestar "by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work."  In re Fender, 12 F3d 480, 487 (5th Cir. 1994)(emphasis added).  Fender was decided under the pre-1994 version of § 330, but the lower courts of the Fifth Circuit have presumed that the "in the community" qualification continues to apply.[15] Thus, to determine whether compensation is reasonable, the central question is, "What is the 'community' for purposes of reviewing comparable services?"[16]

---

[14] 11 U.S.C. § 330(a)(1)(A) (emphasis added).

[15] The most sustained attempt to harmonize the statutory text of § 330 (pre-1994 version) with largely pre-Code jurisprudence is In re El Paso Refinery, L.P., 257 B.R. 809, 819-29 (Bankr. W.D. Tex. 2000).  The Fifth Circuit has been the national leader in developing the jurisprudential tests to determine reasonable fee awards, both in bankruptcy cases and in cases under other "fee shifting" statutes.

[16] In re Temple Retirement Community, Inc., 97 B.R. 333, 342 (Bankr. W.D. Tex. 1989); In re El Paso Refinery, L.P., 257 B.R. 809, 831 (Bankr. W.D. Tex. 2000).

2.   **The trend of the cases reflects the increasingly cosmopolitan nature of bankruptcy practice.**

17.   The decision in In re Temple Retirement, 97 B.R. 333 (Bankr. W.D. Tex. 1989), is emblematic of the analysis Texas bankruptcy courts have traditionally undertaken.[17]   In this case of a Waco area retirement home, the court approved the Dallas firm of Rochelle & Balzerson as debtor's counsel.   The firm incurred fees of $74,472, based on its hourly billing rates that exceeded the average rate charged by attorneys in Waco.

18.   The Temple Retirement court acknowledged, "The community whose standard is applied to attorneys' fees in most civil litigation is normally presumed to be the local community in which the services are rendered."[18]   However, the court continued, "A firm may be justified in recovering their own normal rate in a given case, as opposed to the local rate in the city where the case is pending, when the circumstances of the case justify bringing in outside counsel, as was done here."[19]

19.   Among the non-exclusive factors that justify the award of "non-local" hourly rates are (i) the regional or national scope of the bankruptcy case; (ii) the unavailability of attorneys with the necessary skills in the local community; and (iii) the complexity of the bankruptcy case.[20]   The Temple Retirement court stated:

> Limiting the "lodestar" to that customarily awarded in the Waco-Temple-Killeen market would have effectively deprived the debtor its choice of counsel.   While it may well be that there are firms in that local market who could have handled the case, it cannot be denied that the Dallas firm the debtor chose achieved an extraordinarily favorable result for the estate

---

[17] Temple Retirement, 97 B.R. at 335.
[18] Id.
[19] Id. at 343.
[20] Id. at 342-43; see also Cambern, 134 B.R. at 568-70.

with a minimum of litigation, and did so in a remarkably short period of time.[21]

20.    The analysis applied by the Temple Retirement court to determine the reasonableness of the compensation of the debtor's professionals has been utilized by a number of bankruptcy courts throughout the country.[22]

### 3.    Tyler and Dallas lie in such close proximity as to be considered one community.

21.    The distance from V&E's office in Dallas to the Tyler courthouse is 91 miles as the crow flies.  Good interstate, divided highways connect Tyler with Dallas, and 98 miles is the driving distance.[23]  The drive time is an hour and a half.

22.    The driving distance from the V&E office in Dallas to the Eastern District's Plano duty station is 17 miles, with a drive time of 25 minutes.

23.    The distances from the Court in Tyler to all but one of the divisional offices of the Eastern District are substantially greater than the distance from the Court to

---

[21] Temple Retirement, 97 B.R. at 343.

[22] See El Paso Refinery, 257 B.R. at 831-833; In re Pub. Serv. Co. of New Hampshire, 86 B.R. 7, 10 (Bankr. D.N.H. 1988) (citing the unavailability of local counsel with the requisite skill and experience as justification for the compensation of a law firm from Los Angeles at its standard hourly rates); In re Frontier Airlines, Inc., 74 B.R. 973, 977 (Bankr. D. Colo. 1987) (authorizing the award of New York hourly rates to a law firm's representation of a debtor in Denver because of the complexity of the bankruptcy case); In re Baldwin United Corp., 36 B.R. 401, 402-403 (Bankr. S.D. Ohio 1984) ("To limit fees to the rates charged by Cincinnati bankruptcy lawyers, merely because these cases happened to be filed in Cincinnati, would be a position too capricious and parochial to withstand analysis under § 330 . . . . Consistent with the new position on fees must be the inference that more experienced practitioners with regional or metropolitan practices should be encouraged to accept appointments in cases filed in less populous communities."); In re Atlas Automation, Inc., 27 B.R. 820, 822-823 (Bankr. E.D. Mich. 1983) (citing the potential for independence and innovativeness of non-local counsel and the complexity of the case at hand as justifications for the award of Detroit hourly rates in Flint, Michigan).  In contrast, the reported case law in the Eastern District of Texas, although recognizing the Temple Retirement framework for analysis, has usually found that $165-200 per hour is the top end of the range of rates awardable in the district.  In re Cambern, 134 B.R. 565; (Bankr. E.D. Tex. 1992) ($165 per hour); In re Speeds Billiards & Games, Inc., 149 B.R. 434 (Bankr. E.D. Tex. 1993)($200 per hour for committee counsel in Plano); In re Casey, 173 B.R. 893 (Bankr. E.D. Tex. 1994)($150-180 per hour); In re Holloway, 247 B.R. 197 (Bankr. E.D. Tex. 2000)($210 per hour found to exceed the amount usually allowed for partners).  All of those cases were, however, decided in the context of much smaller and simpler cases and do not analyze the relevant community for purposes of large Chapter 11 cases.

[23] See http://www.mapquest.com.

V&E's office in Dallas. Plano is farther, Texarkana is 50 percent farther, and Beaumont is twice the distance. Only Lufkin is a shorter distance (by only 15 miles).

24.    Physical distance is simply not a relevant factor. The only thing that lies between Tyler and the eastern boundary of the Northern District is Van Zandt County. Essentially Tyler and Dallas should be regarded as one community for purposes of analyzing the Final Application.

### 4.   The community has become the State of Texas.

25.    Judge Larry Kelly has been the leading proponent of standardizing bankruptcy practice rules across the four judicial districts of Texas and even across all bankruptcy courts of the Fifth Circuit. The Fifth Circuit responded by facilitating a meeting in New Orleans of the Chief Judges of Texas and Louisiana, and the group decided to work to streamline and potentially make uniform certain Chapter 11 procedures to facilitate bankruptcy practice across the districts' jurisdictional lines. As a result, a committee chaired by Judge Leif Clark will meet in September to consider proposals. Clearly, the nature of bankruptcy practice has become widespread.

26.    Indeed, as shown in the Declaration of Robert M. Parker, attached as **Exhibit 1**, the relevant community or marketplace is the State of Texas.

### B.   This is a significant case.

27.    This is the largest Chapter 11 proceeding pending in the Tyler Division. The assets, liabilities, and business operations of the Debtors were substantial in size, and the representation was complex.

28.    A substantial complexity was caused by the unusual and complicated system of 19 loans that were originated by different financial institutions, secured by

divergent and commingled security interests in 81 Food Fast stores, and securitized and sold into the bond market:

|  | Food Fast Stores Collateral | Easterhill Stores Collateral | Hill Spring Stores Collateral | Hill Spring II Stores Collateral |
|---|---|---|---|---|
| 1998 Loan Pool Loans | 18 | 5 |  |  |
| 1999 Loan Pool Loans | 2 | 17 |  |  |
| 2000 Loan Pool Loans |  | 8 | 19 |  |
| Morgan Stanley Loans |  | 1 |  | 11 |

From the Debtors' perspective, dealing with such securitized pools of loans was difficult because of the structurally divergent lines and levels of authority of the various types of "servicers" and the unusual business goals and desires of such pools.

29.     As of the Petition Date, the Debtors had assets of $65,911,548.51 in the aggregate and liabilities of $69,745,243.09 in the aggregate, and at least 266 creditors asserted claims against the Debtors.  Prior to the petition date, the Debtors generated aggregate revenues of approximately $140 million per year.  The Debtors operate 84 convenience stores in three states, Texas, Louisiana, and Arkansas, and are one of the largest chains of convenience stores in the three state area.  As evidenced by these cases, In re Dairy Mart, Inc., and In re Houston Convenience L.P., many convenience store chains throughout the country have been hard hit by the recent economic downturn.  Most "C-Store" chains that file Chapter 11 cases end up in liquidation.  Struggling convenience store chains have been monitoring the Debtors' cases.  Therefore, considering the size of the Debtors' estates, the number of creditors affected by these cases, the relative market share of the Debtors in their area, and the effect that

these cases may have on the C-Store industry as a whole, these cases are, at the very

least, regional in nature.

### C.   This case is a success.

30.    As was noted by this Court, V&E's representation of the Debtors, in

conjunction with the efforts of the various parties in interest, resulted in a very favorable

and expedited plan of reorganization that was 100 percent consensual.   The Court

observed:

> I understand and I appreciate the effort that's come in terms of getting all
> these people in the corral.  That's not an easy thing to do with regard to
> seeking their support and presenting to the Court a plan that has, in fact,
> their support.

See Transcript of Confirmation Hearing, p. 26 (Dkt #504).  At the conclusion of  the

Confirmation Hearing, this Court stated:

> Mr. Gibson, obviously there have been substantial efforts made.   I
> congratulate the Food Fast entities.  They obviously make a contribution
> to the Tyler community, as they do to a number of communities in East
> Texas.  I appreciate the cooperation of the parties.  I'm sure that having
> gone through some of those discussions in an earlier life, some of those –
> things are not as specific in this case as they appear to be here this
> morning.
>
> I know it took a considerable amount of professional skill, as well as
> patience to reach this point.  I congratulate the Food Fast entities on the
> confirmation of their plan.  I also appreciate the efforts and the talents of
> the professionals that serve the Estate, and wish them congratulations,
> and good luck to Food Fast, Mr. Gibson, in regard to the consummation of
> the confirmed plan.

See Transcript of Confirmation Hearing at 39-40.

31.    Despite significant hurdles, in just under a year, V&E confirmed a

consensual plan of reorganization that has rehabilitated the Debtors and enabled them

to return to competitiveness and profitability, to the benefit of each of the parties in

interest:   the secured lenders, the unsecured creditors, the taxing authorities, the

employees, and the cities, towns, and rural areas in which Food Fast stores provide gasoline and food to the public.    Although these cases presented issues that could have been highly contentious – and indeed were highly contentious in the conference rooms and at the negotiating table – these results were obtained with minimal litigation before this Court.

### D.  V&E efficiently performed complex Chapter 11 and transactional work.

32.    Even if it were argued that any single issue presented in these cases, if analyzed in isolation, were "routine," taken as a whole, these cases presented sophisticated and unusual issues.

33.    As an initial matter, the Debtors required breathing room to assess their operations and resolve significant problems.  Among the immediate areas on which the Debtors needed to focus were evaluating their profitability on a store-by-store basis, identifying burdensome contracts and leases, implementing effective financial reporting procedures, and investing capital to improve the Food Fast stores.  V&E negotiated with the secured lenders (actually with the servicers of the lenders' securitized loan pools) to enable the Debtors to accomplish each of these tasks and to maximize their opportunity to accomplish a successful reorganization.

34.    As previously stated, the structure of the Debtors' debt financing was anomalous.  The Debtors entered into nineteen loans over a four year period and each loan was secured by the assets relating to the operation of various Food Fast stores. Often, more than one Debtor was obligated, either as a  co-borrower or a guarantor, to pay the principal and interest due under the loans.   In most circumstances, the obligations of these co-borrowers and guarantors were not secured.  Thus, many of the

Loans gave rise to a secured obligation of at least one Debtor and an unsecured obligation of at least one Debtor.

35.    These debt financing arrangements complicated several aspects of the cases including, the analysis of the perfection of the lenders' security interests, the valuation of the lenders' unsecured claims arising from the loans, the apportionment of the lenders' claims against the Debtors' estates, the formulation of the Plan of Reorganization, the restructuring and re-documentation of the secured loans under the Plan, and the determination of appropriate organization, ownership, and capitalization of New Food Fast under the Plan.

36.    Further, in its representation of the Debtors, V&E has been presented with issues relating to the Debtors' environmental remediation obligations, the issue whether to substantively consolidate of the cases, refusal of non-debtor parties to perform under contracts, the treatment of subordinated obligations, and the tax implications of the issuance of securities under the Plan.

37.    Dan Stewart minimized his time in the matter, focusing his effort on negotiating the principal terms of the deal with the creditors and leaving to associate Tonya Ramsey the negotiation of the fine points and documentation and implementation of the deal underlying the plan. Ramsey is a seasoned associate.

38.    In its representation of the Debtors, V&E was also required to utilize extensively a broad panoply of specialists within the firm. The Debtors' cases required the participation of V&E attorneys from seven practice groups, including insolvency and reorganization, secured finance and securitization, tax, corporate, employee benefits, administrative and environmental law, and litigation. The synergy of lawyers in the same office addressing all such issues undoubtedly avoided duplicative billable hours

and enabled V&E to shepherd the Debtors' cases through the reorganization process in an expeditious manner.

### E. A Tyler firm could not have handled the representation.

39.    The Tyler bar has 443 fine lawyers.   The leading legal directory, the Martindale-Hubbell,[24] reports that Tyler has 85 law firms (many of which are single-lawyer firms).  Of the 12 firms that report a bankruptcy practice, six are firms of solo practitioners.  Of the six multi-lawyer firms that have business bankruptcy lawyers:  one five-member firm has one, one two-member firm has two, one nine-member firm has two, and one 19-member firm has one.  None of these firms report any practice in loan securitization or structured finance.

40.    When V&E's time records are examined, it is clear that 33 lawyers in seven specialties – bankruptcy, secured and structured finance, corporate, administrative and environmental, employee benefits, litigation, and tax – were required to complete the job for the Debtors.   Tyler lawyers are as intelligent as lawyers anywhere in Texas, but they lacked the specific expertise gained through experience and the manpower to handle this project on a turn-key basis.

### F. The creditors have approved V&E's rates, and the money is set aside.

41.    Of course, the agreement of the parties in the case does not control the determination of fee awards by the Court,[25] but the consent of the parties who indirectly or directly bear the costs of administration is an important and highly relevant consideration.

---

[24] See http://lawyers.martindale.com.
[25] In re Consolidated Bancshares, Inc., 785 F.2d 1249 (5th Cir. 1986).

42.     The award of fees to V&E at its Dallas hourly rate was clearly contemplated by the interim and final cash collateral orders agreed to by each of the lenders and the Creditors Committee and entered by the Court.  Each of the consensual cash collateral orders  authorized the Debtors to incur expenses for their attorneys' fees in connection with their reorganization and to create a set-aside for their payment.

43.     Pursuant to the budgets incorporated by reference in the first through fourth interim orders (Dkt ## 24, 70, 106, and 136) authorizing the use of cash collateral, the Debtors were authorized to incur attorneys' fees associated with their reorganization in an amount not to exceed $15,000 per week for the period January 23, 2002 through May 13, 2002 (or $255,000 in the aggregate over that same period). Pursuant to the budget incorporated by reference in the final order authorizing use of cash collateral (Dkt #155), the sublimit on attorneys' fees was increased to $25,000.00 per week from May 14, 2002 going forward (or $850,000 in the aggregate from May 14, 2002 through January 10, 2003).

44.     Thus, pursuant to the interim and final cash collateral orders, the Debtors' lenders consented to incurrence of attorneys' fees in the aggregate amount of $1,105,000.00 from January 23, 2002 through January 10, 2003, to be paid from their cash collateral.  The budgeted cap on and the set-aside for the Debtors' attorneys' fees far exceeds the fees in the aggregate amount of $728,895 in fees plus expenses of $80,987.14 sought by V&E in the Final Application.[26]  The $220,000 applied for in the Final Application for the period January 11 to May 12, 2003, is entirely post-confirmation work, mostly heavy transactional work required under the Plan to be performed in order

---

[26] The first fee award to the Debtors' local counsel, Ireland, Carroll & Kelley, P.C., is not included in this comparison.  Such fees and expenses aggregate $62,010.14.

**MEMORANDUM IN SUPPORT OF FOURTH AND FINAL APPLICATION OF**
**VINSON & ELKINS L.L.P. FOR ALLOWANCE OF FEES AND EXPENSES (DKT #824)**     Page - 18

to effectively implement the Plan.  Accordingly, even if all of V&E's incurred fees and expenses, as well as those of Ireland, Carroll & Kelly, P.C., were to be paid in full, that would leave approximately $250,000 available to the reorganized Debtor out of funds already approved by the parties and set aside for that purpose.

45.    Neither the United States Trustee nor any creditor has lodged an objection to the Final Application.

### G.  The lenders and creditors hired New York, Atlanta, and Dallas lawyers; hiring Dan Stewart and V&E leveled the playing field for the Debtors.

46.    Each of the secured lenders and the Creditors Committee employed bankruptcy attorneys from outside of Tyler.  LaSalle, as trustee of the Loan Pool Agreements, employed bankruptcy counsel from Atlanta and Dallas, and Morgan Stanley employed bankruptcy counsel from New York and Dallas.  The Committee employed bankruptcy counsel from Dallas.

47.    Dan Stewart is recognized as a national-stature bankruptcy lawyer with more than thirty years experience.  See attached **Exhibit 2**.  Moreover, V&E had the resources of staff and expertise necessary to effectively represent the Debtors, cause the necessary compromises to be made, formulate and confirm a consensual plan, and complete the rehabilitation and assure the survival of the Debtors, all within a year.

### H.  V&E is the Debtors' choice of counsel.

48.    V&E was engaged to represent the Debtors four months before bankruptcy.  The Debtors' management is pleased with the services provided by V&E and supports this Final Application and the amounts requested by V&E.  The reorganized Debtor has hired V&E for its ongoing legal work.

49.   The Debtors should be able to choose their Chapter 11 counsel, and absent creditors' objections or disqualification found by the Court, that choice should be respected.

I.   **The Debtors had a venue choice.**

50.   The Debtors could have filed the case in the Northern District of Texas.

51.   The general and limited partners of Food Fast, Easterhill, Hill Spring and Hill Spring II were located in Dallas.  As a result of these connections with Dallas, the cases could have been filed in Dallas.

52.   Because Dallas was the center of gravity, nearly all of the negotiations between the Debtors, on the one hand, and the Lenders and/or the Committee, on the other hand, took place in Dallas.

53.   Attorneys' fees should not be subject to 25 percent variance in awardable rate by a happenstance of venue or a 98 mile driving distance.

J.   **The dearth of litigation reflects the significance of the case and the value of Debtors' counsel.**

54.   No notable court rulings resulted from this case.  That is because, on behalf of the Debtors, V&E negotiated out all important issues with the principal parties. The lack of litigation is a positive accomplishment.

55.   The lenders had a great deal of money at stake, and the Debtors were determined to survive and to provide the best possible distribution to all of their constituencies, including the unsecured creditors.  V&E brought all parties to the table and brokered and effectuated the compromises necessary for consensual confirmation of the Debtrors' rehabilitating plan.

56.    Compromise and settlement is the overarching characteristic and goal of a successful Chapter 11 proceeding.

> The glue that often holds the bankruptcy process together is the ability of parties to resolve disputes by settlement instead of litigation.  If bankruptcy judges had to try a much larger percentage of matters than they currently do, the system would surely bog down.  Thus, the sanctity of settlements can hardly be overemphasized.

Leif M. Clark, <u>Symposium Survey:  Bankruptcy</u>, 28 Tex. Tech L. Rev. 299, 324 (1997).

See Valencia, <u>The Sanctity of Settlements and the Significance of Court Approval:</u> <u>Discerning Clarity from Bankruptcy Rule 9019</u>, 78 Ore. L. Rev. 425 (1999).

## IV.    CONCLUSION

57.    Considering the nature, the extent, and the value of its services, and taking into account all relevant factors of Section 330 and the case law, V&E has earned its fees.  Particularly in the circumstances of this successful case, the award should be made at its customary rates.

For the foregoing reasons, V&E respectfully requests that this Court approve its Final Application.

Respectfully submitted,

**VINSON & ELKINS L.L.P.**
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Tel:  (214) 220-7700
Fax: (214) 999-7716

By:___*/s/ Josiah M. Daniel, III*_____
Josiah M. Daniel, III, SBT #05358500
Daniel C. Stewart, SBT #19206500
Tonya Moffat Ramsey, SBT #24007692

**COUNSEL FOR THE DEBTORS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Memorandum was sent by email and U.S. Mail to the parties listed below, with exhibits, on August 13, 2003.

Timothy O'Neal, Attorney-Advisor
United States Trustee
Office of the United States Trustee
110 North College, Ste. 300
Tyler, TX  75702

William Neary
United States Trustee
1100 Commerce St., Rm. 9C60
Dallas, TX  75242

Rick B. Antonoff
Greenberg Traurig
200 Park Avenue
New York, NY  10166

Robert J. Clary
Owens, Clary & Aiken, L.L.P.
700 N. Pearl, Ste. 1600
Dallas, TX  75201

Charles Campbell
Jeffery W. Cavender
Long Aldridge & Norman LLP
303 Peachtree Street, Ste. 5300
Atlanta, Georgia 30308

Food Fast Holdings, Ltd.
Attn: Bill Gibson
4703 D.C. Drive, Ste. 100
Tyler, Texas  75701

Albert G. Hill, III
1601 Elm St., Suite 5000
Dallas, Texas  75201

Roman Kupchynsky
Gardere Sewell Wynne LLP
1601 Elm Street, Ste. 3000
Dallas, TX  75201

_____ */s/ Josiah M. Daniel, III* _____
One of Counsel

740891_5.DOC